The Full Commission reviewed the Opinion and Award entered by the Deputy Commissioner, the record before the Deputy Commissioner, and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission reverses the Opinion and Award of the Deputy Commissioner and finds that plaintiff has failed to establish a new occupational disease.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pretrial agreement as:
 STIPULATIONS
1. Defendant has regularly employed three or more employees and is subject to and bound by the provisions of the North Carolina Workers' Compensation Act. Plaintiff was employed by defendant from some time in August 1989 through 17 May 1996.
2. Defendant is a duly-qualified self-insured under the Act.
3. After his date of separation from defendant, plaintiff was employed by Best Buy from 1 July 1996 through at least 5 January 1998.
4. Defendant represents that plaintiff's average weekly wage at the time of his separation on 17 May 1996 was $506.66. This yields a compensation rate of $337.78.
5. In addition to the deposition transcripts and the exhibits attached thereto, the parties stipulated into evidence in this matter a Form 22 wage chart (stipulated exhibit one) and copies of plaintiff's employment and payroll records (marked collectively as stipulated exhibit two). The parties have also submitted additional stipulated medical records from Dr. Peter G. Dalldorf and Dr. Kai-Uwe Mazur, all of which are incorporated into the record in this matter. Plaintiff introduced and the undersigned admitted into evidence in this matter a letter from Dr. Steiner dated 16 May 1996 to defendant (plaintiff's exhibit one). Defendant introduced and the Deputy Commissioner admitted into evidence in this matter an incident report from plaintiff dated 2 November 1994 (defendant's exhibit one) and an incident report from plaintiff dated 18 August 1993 (defendant's exhibit two). Plaintiff asked that the Commission take judicial notice of the Court of Appeals opinion rendered 16 February 1999 and reported per Rule 30(e) and therefore without precedential value, Gillenwater v. North Carolina Dept. of Transp., No. COA98-515 (slip op. filed 16 February 1999).
6. The issues to be determined are whether plaintiff contracted a compensable occupational disease on or about 23 October 1996, and if so, to what benefits is he entitled. Plaintiff, who alleges that he suffers from occupationally-induced stress, contends that he is entitled to ongoing total disability compensation beginning 24 February 1999.
 ***********
Based upon the greater weight of the competent and credible evidence of record in this matter, the Full Commission makes the following additional
 FINDINGS OF FACT
1. On the date of the deputy commissioner hearing in the matter, plaintiff was forty-eight years old and was not employed in any capacity. Plaintiff has a preexisting history of anxiety attacks that started when he was young, and a family history of psychiatric difficulties. In 1979, plaintiff attempted to commit suicide by cutting his wrists and taking 60 valium tablets. The exact nature and extent of plaintiff's pre-1995 psychological condition is unclear based on the evidence in the record, save for the fact that he has had lifelong problems with anxiety and other psychological disorders.
2. Plaintiff began working for defendant in August 1989 in the position of bridge worker. In the course of performing his job as a bridge worker in early 1992, plaintiff was standing on the side of the road beside a Department of Transportation ("DOT") truck. A drunk driver hit the DOT truck and the DOT truck in turn hit plaintiff. When he was hit by the truck, plaintiff was thrown into the eastbound lane of I-40 where he was almost hit again by another vehicle. Plaintiff sustained multiple physical injuries as a result of this accident, and was out of work for approximately sixteen months. Plaintiff returned to work in August 1993. Plaintiff's workers' compensation claim for his 1992 injury is compensable. Plaintiff did not receive any psychological or psychiatric treatment for his 1992 injury, at least until he sought treatment in 1995.
3. In September or October 1993 plaintiff became a bridge maintenance inspector for defendant. His job in this capacity was to inspect bridges throughout the western part of the state. In this position, plaintiff worked as a member of a two-man crew together with his supervisor. From 1993 through June 1995, plaintiff's co-worker and supervisor was Walsher Dale Hicks, Jr. Thereafter, Max Ford was his co-worker and supervisor.
4. Dale Hicks reported that plaintiff's work performance was poor during the time period that they worked together. Hicks reported that plaintiff was late for work two or three times per week. Plaintiff told Hicks that he was having problems sleeping and was out late at night attending all-night "rave" music parties.
5. Max Ford reported having problems with plaintiff's work performance from the beginning of his supervisory relationship with plaintiff. Plaintiff was having trouble with photographs of the inspected bridges. The photographs would be missing or mislabeled. In addition, plaintiff's drawings of bridges and their measurements would be illegible or otherwise useless. Several trips were made back to the inspected bridges to get more documentation and to correct plaintiff's work. Ford took over the duty of taking the photographs because of the continuing problems. Further, Ford explained that plaintiff had a continued problem with tardiness. Ford was requested by his supervisor, Mike Doty, to monitor plaintiff's absences and tardiness. Plaintiff's behavior would be better after he was counseled by Ford and/or Doty about his tardiness, but the pattern of either not reporting to work on time or not calling in until after he was already late would return shortly after the counseling. The tardiness and absences were significant because they worked as a two-man crew and plaintiff's delay would affect both plaintiff and his partner's ability to proceed with the bridge inspections. Several meetings were held with plaintiff, Ford and Doty concerning the absences and tardiness. At these meeting plaintiff would admit his problems and explained that he would correct his behavior.
6. Ford described plaintiff as a person who was coherent most of the time and at other times was "spaced out." Plaintiff would fall asleep on the job while Ford was talking to him. Plaintiff explained to Ford that he had trouble sleeping, and would be up late at night on the internet, and attended all night "rave" dance parties where he used the drug Ecstasy.
7. Plaintiff denied telling his co-worker, supervisor that he attended rave music dances and denied the use of the drug Ecstasy. Plaintiff also denied signing personnel forms and admitting that he had problems with attendance. Plaintiff did admit to having trouble sleeping and liking rave music. Plaintiff's testimony with regard to rave music and the use of Ecstasy is not credible based on the questions of plaintiff's counsel to Ford and Hicks. As an example, plaintiff specifically denied attending rave dance parties and the use of the drug Ecstasy. His counsel's questions, however, appear to acknowledge this behavior and explained that the parties were on weekends and that the drug was not taken voluntarily.
8. In late 1993 or early 1994, plaintiff reported that a bridge in his area was in need of immediate repair of a concrete patch that plaintiff felt could fall. Plaintiff's report was processed by his immediate and general supervisors and was inspected by DOT personnel from Raleigh who agreed that the bridge needed immediate repair. The request to perform the repair was apparently was not acted upon by a local engineer, and on or about June 1994, a piece of concrete fell from the bridge and hit a car. The concrete broke through the windshield of the car and injured the driver. Plaintiff contends that he received angry telephone calls from the public impugning his ability to do his job. His immediate and general supervisors were not aware of the telephone calls or any threats or harassment.
9. In March 1995, plaintiff began treatment with Jane L. Steiner, M.D., a Board Certified Psychiatrist, for stress, depression, and panic attacks. Dr. Steiner explained in her deposition that plaintiff, by history, had been suffering from anxiety attacks since childhood and that this has been a problem throughout his life. Dr. Steiner identified several recent stressors in plaintiff's life which contributed to the condition that he presented in March 1995 and on subsequent visits. These stressors included anxiety about returning to work as a bridge inspector, death of a close friend and doctor, and death of his brother. Dr. Steiner's diagnosis was generalized anxiety disorder, panic disorder with agoraphobia, a chronic dysthymic disorder (working depression), post traumatic stress disorder, and major depression. Dr. Steiner expressed that it was very understandable that plaintiff would have anxiety about returning to work after his 1992 injury when he was struck by a drunk driver while in the course of his employment, and she was impressed that he was able to return to work after this incident. She expressed that plaintiff had post traumatic stress disorder from the 1992 accident.
10. Dr. Steiner indicated that plaintiff's personal psychological and family history indicated that he was predisposed for depression, anxiety, and panic attacks. The 1992 accident, however, would have been sufficient to cause anxiety attacks and panic attacks in someone who was not predisposed. Dr. Steiner explained that plaintiff's co-workers may not have noticed or understood his illness and could have seen his symptoms as an unwillingness to report to work and as a hesitancy to perform certain activities. Dr. Steiner's assumptions about how plaintiff's behavior might be perceived by his co-workers and supervisors is consistent with the testimony from Mr. Hicks and Mr. Ford.
11. In May 1996, plaintiff was given notice of a hearing concerning his potential dismissal due to his tardiness and unsatisfactory work performance. In response to this notice, plaintiff went to see Dr. Steiner and sought her assistance. On 15 May 1996, Dr. Steiner indicated that plaintiff should be placed on medical leave due to his extreme anxiety and depression. On 16 May 1996, the pre-disciplinary conference was held so that plaintiff could respond to the recommendation for his dismissal. On that same date, Dr. Steiner wrote a letter to John Emerson, a state bridge inspection engineer, and offered her opinion that plaintiff's work difficulties had been a direct result of his severe depression, and that, if plaintiff were placed on medical leave, his job effectiveness might improve. However, despite this out of work note and Dr. Steiner's letter, plaintiff's employment with defendant was terminated effective 17 May 1996 on the grounds of excessive absenteeism and poor work performance.
12. Dr. Steiner believes that the 1992 accident was a cause of the depression, post traumatic stress disorder, anxiety, and panic attacks. She expressed that his return to work as a bridge inspector did not allow him to recover from the psychological injury received as a consequence of the 1992 accident.
13. In January 1996, plaintiff was first seen by Robert V. Buccini, M.D., a gastroenterologist, for heartburn and vomiting of blood. Dr. Buccini performed GI studies and found that plaintiff had ulcer disease in his stomach and small intestine. GI studies also revealed scarring of the GI tract, which indicated that plaintiff had suffered from ulcers in the past. Dr. Buccini explained that the strongest current medical opinion is that stress does not cause ulcers, but that a person's reaction to stress causes the ulcer. History of plaintiff revealed that consumption of aspirin, including BC powder, for pain management for the 1992 accident was a proximate cause for the ulcer disease. Further, job stress could cause headaches for which plaintiff was taking aspirin based products.
14. Dr. Buccini reported four hospitalizations over a six month period for plaintiff because of recurrent ulcer disease, including bleeding ulcers.
15. Dr. Buccini reported that plaintiff had a lot of stress on his job, and in particular, cited plaintiff's stress related to being a whistle-blower in reporting the bridge defect where a portion of the bridge collapsed which led to a motorist's injury.
16. Based on the greater weight of the credible evidence, plaintiff has failed to prove a new compensable injury, i.e.: an occupational disease. Dr. Steiner testified that the cause of plaintiff's depression, post traumatic stress disorder, anxiety, and other psychological disorders was the 1992 accident. Further, Dr. Buccini relates the use of the aspirin-based products for pain management to the 1992 accident. Necessary medical care resulting from a change of condition for the 1992 injury may be compensable under the 1992 workers' compensation claim; the change of condition does not create a new workers' compensation claim.
17. Further, neither Dr. Steiner nor Dr. Buccini testified that plaintiff's work placed him at a greater risk of sustaining his psychological and/or GI conditions than members of the general public not so employed. In response to questions concerning increased risk, the health care providers responded that plaintiff because of his pre-disposition was at a greater risk for injury than the general public. These health care providers did not testify that the nature of plaintiff's employment placed him at any increased or peculiar risk than the general public not so employed would be exposed. More particularly, Dr. Buccini expressed that plaintiff was pre-disposed to stress-induced headaches and would have stress-induced headaches even if he had won the lottery and retired to Bermuda. Therefore, based on the greater weight of the credible evidence, plaintiff has failed to establish a new injury separate and beyond his compensable 1992 accident.
18. The greater weight of the credible evidence fails to establish that the conditions of plaintiff's employment after his return to work in August 1993, through his termination on 17 May 1996, was a substantial contributing factor to the alleged psychological and/or GI diseases.
19. Plaintiff was not an employee of defendant on 23 October 1996, the date that he allegedly contracted the occupational disease. Plaintiff's employment was terminated on 17 May 1996.
 ***********
The foregoing stipulations and findings of fact result in the following
 CONCLUSIONS OF LAW
1. Although plaintiff may have proven that he has suffered psychological and GI injuries as a direct consequence of a compensable 1992 injury and/or as a consequence of his treatment for the compensable 1992 injury, a change of condition from a compensable injury, if timely filed, is compensable under the original workers' compensation injury and does not constitute a separate and new injury. See N.C. Gen. Stat. § 97-47. The issue of modification of the prior Award, if warranted, for the 1992 injury is not before the Commission in this action, and, therefore, the Commission does not determine herein whether plaintiff is entitled to additional benefits under the prior Award.
2. Plaintiff has not proven by the greater weight of the competent evidence that he has sustained a compensable occupational disease. N.C. Gen. Stat. § 97-53(13). To establish a right to workers' compensation benefits for an occupational disease, the employee must show: (1) the disease is characteristic of individuals engaged in the particular trade or occupation in which the employee is engaged; (2) the disease is not an ordinary disease of life to which the general public is equally exposed with those engaged in that peculiar trade or occupation; and (3) there is a casual relationship between the disease and the employee's employment. Rutledge v. Tultex Corp., 308 N.C. 85, 93,301 S.E.2d 359, 365 (1983); Hardin v. Motor Panels, Inc.,136 N.C. App. 351, 524 S.E.2d 368 (2000). Plaintiff is required to establish that his condition developed due to causes and conditions which are characteristic of and peculiar to his employment with defendant, but excluding all ordinary diseases of life to which the general public with a similar predisposition as plaintiff is equally exposed outside of employment. N.C. Gen. Stat. § 97-53(13). Booker v. Duke MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979). Plaintiff has failed to prove that his employment placed him at an increased risk of developing his disease as compared to members of the general public or to members of the general public with the same predisposition for depression, anxiety, and ulcer disease. Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359
(1983). Further, plaintiff has failed to establish that the conditions of his employment, other than the 1992 compensable accident, were a substantial contributing factor to his alleged occupational disease. SeeHardin v. Motor Panels, Inc., 136 N.C. App. 351, 524 S.E.2d 368 (2000).
3. Plaintiff's attempts to categorize his psychological and GI diseases as the result of employment discrimination, wrongful termination, or other employment claim does not establish a claim for workers' compensation. Although workers' compensation is often the exclusive remedy for injuries, including occupational diseases, sustained in the course and scope of employment, workers' compensation is not the proper remedy for employment claims for risks which do "not arise out of" the employment. Compare N.C. Gen. Stat. § 97-10.1 (workers' compensation is exclusive remedy) with Busher v. Southern Food Service,73 F. Supp.2d 556 (M.D.N.C. 1999) (claim for emotional distress arising from termination and denial of FMLA not precluded by Act); Harrison v.Edison Brothers Apparel Stores, Inc., 724 F. Supp. 1185 (M.D.N.C. 1989) (emotional damage claim based on acts not in the normal course of employment not precluded by Act); Hogan v. Forsyth Country Club,79 N.C. App. 482, 340 S.E.2d 116, disc. review denied, 346 S.E.2d 140 (1986) (Act does not preclude action for civil wrongs which are outside the scope of the Act). The Commission makes no finding as to whether plaintiff has any valid employment claims which are outside the Workers' Compensation Act and acknowledges that its opinion concerning the validity of the claims is immaterial. See Abels v. Renfro Corp.,108 N.C. App. 135, 423 S.E.2d 479 (1992) (Commission's findings concerning compensability of injury irrelevant to § 97-6.1 claim).
4. Plaintiff's request to be reimbursed for the cost of the transcript of the deposition of Max Ford is denied. Plaintiff has failed to establish that he was unreasonably caused to incur additional expense because of the actions of the defendant, and thereby the Full Commission in its discretion denies plaintiff's request to be reimbursed for the cost of this deposition. N.C. Gen. Stat. § 97-80(b).
 ***********
The foregoing findings of fact and conclusions of law result in the following
 AWARD
1. Plaintiff's claim is denied.
2. Each party shall bear their own costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER